**THE TRIAL LAW FIRM, LLC**
Mart Harris, Esquire
Pa. Id. No. 319504
412.588.0030 | MH@TLawF.com

Nelson Berardinelli, Esquire
Pa. Id. No. 310581
412.588.0930 | NB@TLawF.com

The Pittsburgher
428 Forbes Avenue, Suite 1700
Pittsburgh Pennsylvania 15219

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

| | |
|---|---|
| **JAMAL WOODSON;** and **SLAAM, INC.** Plaintiffs, vs. **OAKLAND CATHOLIC HIGH SCHOOL, INC.**; and **MARISA GRECO** in her individual capacity. | Case No.   2:20-cv-1951  **COMPLAINT IN CIVIL ACTION**  **JURY TRIAL DEMANDED** |

### <u>COMPLAINT</u>

NOW COMES the Plaintiffs, Jamal Woodson, and SLAAM, Inc. by and through their attorneys, The Trial Law Firm, LLC, Mart Harris, Esquire, and Nelson Berardinelli, Esquire, and files the within Complaint against the Defendants.

**Parties**

1. The first Plaintiff is Jamal Woodson ("Mr. Woodson"). Mr. Woodson is an adult male individual who resides in Allegheny County Pennsylvania.

2.  The second Plaintiff is SLAAM, Inc. ("SLAAM"). SLAAM is a Pennsylvania non-profit corporation.

3.  The first Defendant is Oakland Catholic High School, Inc. ("OCHS"). OCHS is a Pennsylvania non-profit corporation with offices at 144 North Craig Street, Pittsburgh PA 15213.

4.  The second Defendant is Marisa Greco ("Mrs. Greco"), who is an adult individual who was employed by OCHS as a principal during the relevant time period.

**Personal Jurisdiction of the Parties and Venue**

5.  Personal Jurisdiction over Mr. Woodson and SLAAM exists, as they avail themselves of the jurisdiction of this Court.

6.  Personal Jurisdiction over OCHS exists because it has a regular place of business in the Western District of Pennsylvania within the Pittsburgh Division's territory.

7.  Personal Jurisdiction over Mrs. Greco exists because she worked during the relevant time period in the Western District of Pennsylvania within the Pittsburgh Division's territory.

8.  The events and omissions which give rise to the claims asserted herein occurred in the Western District of Pennsylvania in or around Pittsburgh, Pennsylvania. Therefore, pursuant to 28 U.S.C. § 1391(b), the District Court situated in Pittsburgh Pennsylvania is the proper venue for this case.

**Subject Matter Jurisdiction**

9.  This Civil Action is brought pursuant to 42 U.S.C. § 1981. Therefore, pursuant to 28 U.S.C. § 1331, the United States District Courts have Subject Matter Jurisdiction over this dispute.

**Facts of the Case**

10.    Mr. Woodson worked as an assistant varsity girls' basketball coach/head junior varsity girls' basketball coach at OCHS from approximately August 1, 2013 through approximately March 12, 2020. His varsity duties were to assist the head coach for all strategy and tactics to be used in upcoming games, and to provide coaching to the players during an active game. His JV duties were to run the JV practices and prepare them to play at the varsity level. Mr. Woodson did not provide religious instruction to OCHS students.

11.    One of the first things Mr. Woodson did as an employee was to make a pre-game warm-up mix tape for the basketball team. Mr. Woodson was explicitly careful to only include songs that were "clean" (*i.e.* without explicit lyrics or content). However, the music chosen was classically associated with Black people.

12.    In a meeting with Mr. Woodson, Mrs. Zelno (the principal of OCHS at the time) stated that his warm-up playlist was "very offensive and disrespectful." She continued that OCHS was "not a public school so do not ever make music again for the team."

13.    Mr. Woodson, fearing for his job, capitulated and agreed to follow Ms. Zelno's directive.

14.    After Mr. Woodson was instructed that the music was improper, he learned that his playlist had been, verbatim, adopted by the volleyball team. The volleyball staff, all white, played the exact same song list, in the exact same song order, as their own pre-game warm-up music.

15.    In or around 2018, the head basketball coach for the Varsity team, Shannon Boyle ("Ms. Boyle"), was terminated.

16.    It is common within sports that when a head coach is terminated, their assistant coaches will subsequently be terminated and sometimes, promoted to head coach. Therefore, Mr.

1 Woodson asked Mrs. Greco if his job was in jeopardy. Mrs. Greco indicated that he was not
2 being fired.
3     17. Upon learning he was not being fired, he applied for the position of head coach.
4     18. In his five (5) years as the head coach for the JV team, and an assistant coach for
5 the varsity team, Mr. Woodson achieved significant results. Mr. Woodson was in charge of
6 practices, strategy, and ultimately led his JV team to two undefeated seasons in 2015-2016 and
7 2016-2017. Mr. Woodson also founded and runs a large basketball organization, SLAAM, which
8 trains children for competitive basketball play. From 2013 through 2019, SLAAM rented the
9 OCHS gymnasium for training.
10     19. Despite his expertise in the industry and success with OCHS's JV team, in his
11 interview, Mr. Woodson was treated coldly, to the point that it was apparent to Mr. Woodson
12 that he would not be promoted to head coach for the varsity team; and instead, he felt like a
13 "token" Black interviewee.
14     20. Ultimately, a white woman was hired to be the head basketball coach for the
15 Varsity team instead of Mr. Woodson in or around June 2018. Upon information and belief, Mr.
16 Woodson was more qualified to coach on the basis of his 14 years' coaching experience, his
17 expertise in training basketball players via SLAAM, and specifically due to his back-to-back
18 undefeated seasons, whereas, the white woman who was hired did not have any coaching
19 experience.
20     21. In or around July 2019, the athletic director Ms. McCracken informed Mr.
21 Woodson that SLAAM would no longer be able to rent OCHS's gymnasium, because "we no
22 longer rent to for-profit businesses."
23     22. Mr. Woodson replied that SLAAM is a non-profit organization.
24     23. Ms. McCracken replied that she would "get back" to Mr. Woodson.
25

24. Three days later, OCHS changed its reason to that it "did not want to be accused of recruiting."

25. Mr. Woodson stated to Ms. McCracken that he felt that the reason OCHS refused to contract with SLAAM was because he is Black. He also indicated at that time that he felt that he had been treated unfairly on the basis of race in numerous respects, including but not limited to informing her that he had been "singled out" because three days prior, the "only" reason he couldn't rent the gym is because SLAAM was "for-profit" as well as the incidents discussed above regarding the warmup music and his experiences in the interview for head coach.

26. A few days after Mr. Woodson informed Ms. McCracken that he thought OCHS's decision was made on a racially discriminatory basis, Ms. McCracken unilaterally modified the terms of the rental agreement between OCHS and SLAAM, to include rules for SLAAM's use of the gymnasium, as well as raising the price of the rental by $500.00. The new rate was in effect from August 2019 through December 2019.

27. In or around December 2019, Ms. McCracken informed Mr. Woodson that, "upon further review," SLAAM would not be able to rent OCHS's gymnasium anymore due to "too many conflicts using the gym."

28. Upon information and belief, including but not specifically limited to the fact that OCHS's gymnasium schedule was publicly available information online, the schedule did not have "too many conflicts," as the schedule had not substantially changed from the previous six (6) years that SLAAM rented the OCHS gymnasium.

29. Upon information and belief, also in or around December 2019, a white volleyball coach at OCHS requested to rent the OCHS gymnasium and was permitted to do so, despite the "conflicts."

30. As a result, SLAAM had to rent the gymnasium at another school at a substantially higher rate of $100.00 per hour as opposed to the flat rate of OCHS.

31. In approximately February 2020, local news station WTAE asked Mr. Woodson if they could, for a segment memorializing the death of Kobe Bryant, interview him.

32. In 2017, Mr. Woodson received a similar invitation when he was invited to film a segment for "Good Morning America." At that time, he was told that OCHS administration would have to approve his request.

33. Mr. Woodson was honored to be asked to be a part of the national mourning over the death of Kobe Bryant and mindful of the required procedure, took the request to OCHS's Athletic Director Molly McCracken.

34. Ms. McCracken stated she would run it by the OCHS administration.

35. Within an hour of Mr. Woodson's communication with Ms. McCracken, Mr. Woodson was forbidden by OCHS to do the interview.

36. A few days later, Mrs. Greco reprimanded Mr. Woodson for his even asking permission to fulfill WTAE's request.

37. Later, on or about February 10, 2020, after OCHS played North Allegheny in basketball, Mrs. Greco was having a conversation with (white) varsity head coach Brianne O'Rourke. Mr. Woodson and Ms. April Robinson (a white assistant basketball coach) were standing nearby, but were not a part of, or involved in, the conversation, and Ms. Robinson then walked away, then Mr. Woodson also walked away while Ms. O'Rourke and Mrs. Greco continued their conversation.

38. On or about February 11, 2020, at around 9:00 a.m., Mrs. Greco called Mr. Woodson.

39. During that call:

    a. Mrs. Greco told Mr. Woodson that his "disrespect" was "on notice;"

      b. According to Mrs. Greco, it was "disrespectful" for Mr. Woodson to have walked away from the aforementioned discussion Ms. O'Rourke had with Mrs. Greco the day prior;

      c. Mr. Woodson asked Mrs. Greco how he could be "disrespectful" given that he was not involved in the conversation; and

      d. Mrs. Greco's response was, "Jamal, stop resisting, you are only making it worse" before she hung up on Mr. Woodson.

40. This same behavior, which apparently was disrespectful and embarrassing, was only so when Mr. Woodson walked away, not when Ms. Robinson walked away from that same conversation.

41. The next month, on or about March 12, 2020, Mrs. Greco fired Mr. Woodson for "not meeting the Oakland Catholic standard."

42. When Mr. Woodson asked for the real reason he was being fired, Mrs. Greco confirmed that it was because he had asked for permission to use the gym "when [he] should have known not to ask."

43. Around the same time that Mr. Woodson was reprimanded and then terminated for asking permission to do something, as opposed to doing something without first asking permission, Ms. Robinson, without asking permission, actually went through with the Pittsburgh Post-Gazette coming into OCHS, taking pictures as part of their story (regarding the same basketball team that, when Mr. Woodson was the facilitator, he was fired).

44. Upon information and belief, Ms. Robinson was not reprimanded or otherwise punished, despite that she didn't even ask for permission, while Mr. Woodson was terminated for asking for permission.

45. These causes of action follow:

# COUNT I

## 42 U.S.C. § 1981

## Race Discrimination in Contracts (Retaliation – Wrongful Termination and Other Materially Adverse Actions)

*All Plaintiffs v. All Defendants.*

46. All other paragraphs of this complaint are incorporated as if set forth at length herein.

47. Mr. Woodson engaged in protected activity as demonstrated in ¶ 25 of this Complaint, when he complained that OCHS engaged in race discrimination.

48. Within days of Mr. Woodson's protected activity (on behalf of himself and SLAAM), OCHS engaged in a materially adverse action as demonstrated in ¶ 26 of this Complaint, when OCHS unilaterally modified the terms of SLAAM's rental agreement; both increasing the rate of the contract as well as adding restrictions against SLAAM in order to punish Plaintiffs, and discourage further protected activity.

49. OCHS's action can be inferred as retaliatory on the non-exclusive basis of the temporal proximity between the protected activity and materially adverse action, as well as a pattern of antagonism demonstrated in ¶¶ 21-29, 33-36, and 38-42 of this Complaint.

50. As a direct and proximate result of OCHS's retaliatory actions, Plaintiffs suffered injury and damages.

51. OCHS engaged in further materially adverse actions as described in ¶ 27 of this Complaint, by refusing to contract with SLAAM in order to punish Plaintiffs and discourage further protected activity.

52. OCHS's action can be inferred as retaliatory on the non-exclusive basis of temporal proximity between the protected activity and materially adverse action, as well as a pattern of antagonism and the shifting and illogical and disparate reasons provided by OCHS for

its modifications and refusal to enter into contracts with SLAAM as discussed in ¶¶ 21-29 of this Complaint.

53. As a direct and proximate result of OCHS's retaliatory actions, Plaintiffs suffered injury and damages.

54. After Mr. Woodson's protected activity as described in ¶ 25 of the Complaint, in continuation of the pattern of antagonism described above, OCHS terminated Mr. Woodson's employment.

55. OCHS's action in terminating Mr. Woodson's employment can be inferred as retaliatory on the non-exclusive basis of a pattern of antagonism as demonstrated in ¶¶ 21-29 and 35-44, and the shifting and illogical and disparate reasons provided by OCHS for Mr. Woodson's termination as detailed in ¶¶ 36-44.

56. As a direct and proximate result of OCHS's retaliatory actions, Plaintiffs suffered injury and damages.

## COUNT II

### 42 U.S.C. § 1981

### Race Discrimination in Contracts (Wrongful Termination)

*Mr. Woodson v. All Defendants*

57. All other paragraphs of this complaint are incorporated as if set forth at length herein.

58. Mr. Woodson is a member of a protected class, since he is Black.

59. OCHS subjected Mr. Woodson to an adverse employment action when he was terminated as stated in ¶ 41 of this Complaint.

60. OCHS's actions can be inferred as discriminatory on the non-exclusive basis of the shifting and illogical and disparate reasons provided by OCHS for Mr. Woodson's termination as detailed in ¶¶ 36-44.

61. As a direct and proximate result of the adverse employment action of termination, Mr. Woodson suffered injury and damages.

## COUNT III

### 42 U.S.C. § 1981

### Race Discrimination in Contracts (Failure to Promote)

*Mr. Woodson v. OCHS*

62. All other paragraphs of this complaint are incorporated as if set forth at length herein.

63. Mr. Woodson is a member of a protected class, since he is Black.

64. Despite applying and being qualified for the position, Mr. Woodson was not hired to be OCHS's head men's basketball coach in 2018.

65. Instead of Mr. Woodson, who had extensive coaching experience generally, as well as specific and successful coaching experience with OCHS, not to mention the exact players on the team (who had been extremely successful junior varsity players under his tutelage), OCHS hired a white individual who has no coaching experience.

66. As a direct and proximate result of not being promoted, Mr. Woodson suffered injury and damages.

WHEREFORE, Plaintiffs, Jamal Woodson and SLAAM, Inc. respectfully request judgment in their favor, and all available damages under the law to include: 1) backpay from June 30, 2018 through March 12, 2020 of the difference between head and assistant coach; 2) backpay from March 12, 2020 through the date of judgment for lost wages; 3) the difference between the rate to rent OCHS's gymnasium before and after July 31, 2019; 4) the difference between the rate to rent a gymnasium before and after December 31, 2019; 5) non-economic compensatory damages including emotional pain and suffering; 6) punitive damages to discourage OCHS and others from engaging in similar illegal conduct; 7) pre-judgment interest

on economic damages at the prevailing rate through the date of judgment; 8) post-judgment interest on the judgment at the prevailing rate through the date of judgment and the date of satisfaction of the judgment; 9) attorney's fees to be established by post-trial petition; and 10) costs of suit to be established by post-trial bill.

Respectfully submitted by:

**THE TRIAL LAW FIRM, LLC**

By: _____
Mart Harris, Esquire
Nelson Berardinelli, Esquire
*Trial Lawyers for Plaintiffs*